ARMCO DRAINAGE & METAL PRODUCTS, INC., Appellant, v. STATE OF NEW YORK, Respondent.   (Claim No. 32880.)

Third Department, July 23, 1957.

Robert P. Knapp, Jr., for appellant.

Louis J. Lefkowitz, Attorney-General (John R. Davison and Dunton F. Tynan of counsel), for respondent.

BERGAN, J. The claimant had perfected a method of drainage tunnel construction using procedures and equipment which made it feasible to do tunnel work largely with common labor, but requiring additionally a few specially trained men. This method was especially adapted to a " liner plate " type of drainage tunnel construction.

The road contract from which the controversy in this case developed was made between the State and a general contractor; and claimant entered into a subcontract with the general contractor for the drainage tunnel work. The State approved claimant as a subcontractor for the work but there is no direct contractual relation between the State and claimant.

It is stipulated that in the preparation of the specifications for the drainage tunnel work the State engineers expected that the construction methods and materials developed by claimant would be used in the work; but it is not stipulated that it was contemplated that the claimant would be given the subcontract by the prime contractor.

There was no express provision of the contract which permitted or required this work to be done with common labor, or which made any exact specification as to what classifications of labor would be used for this particular work. There was, however, attached to the State's proposal on which the prime contractor submitted its bid, " a schedule of minimum prevailing wages to be paid upon the project in accordance with Section 220 of the Labor Law." It is further stipulated that the " only job classification " which was " set forth " in that schedule which would be " applicable to the construction of " the tunnel here involved " was the classification of ' laborer ' at the rate of $1.71 per hour."

The duties of public officers touching upon schedules to be paid to workmen on public works are defined by section 220 of the Labor Law. The State Industrial Commissioner is required to " ascertain and determine the schedule of wages to be paid " on each public work " prior to the time of the advertisement for bids " and " such schedule ", i.e., that determined by the Industrial Commissioner, shall " form a part of the specification for the work." (§ 220, subd. 3, second par.)

The State Department of Public Works, as the department having jurisdiction of the contract, has certain auxiliary functions in respect of the wage schedules required by the statute, but it is clear that the ultimate decision as to the schedule, and the duty to " ascertain " as well as determine what is the correct prevailing wage lies with the Industrial Commissioner. (Subd. 3, second par., *supra.*)

The Department of Public Works is required to help in this process, but it has no power of decision. It shall be its duty " to ascertain from the plans and specifications the classification of workmen * * * to be employed on such project " (subd. 3-a), but what it does with this information is merely to file it with the Industrial Commissioner " together with a statement of the work to be performed by each such classification ". It is, in turn, the duty of the Industrial Commissioner upon the basis of this information " to make a proper classification " of the workmen and to make " a determination of the schedule of wages to be paid therefor ".

The administrative processes by which " laborer " at " $1.71 per hour " was placed as " the only job classification * * * applicable to the construction of " the tunnel work here involved, are not spelled out more precisely in the stipulation; but it must be assumed both that the Department of Public Works advised the Industrial Commissioner of the nature of the work, i.e., " the work to be performed by each such classification " (subd. 3-a) and that the Industrial Commissioner made a determination on these matters.

The main contract was entered into in June, 1952 and on September 1, 1952 claimant began the work on its subcontract; and on October 14, 1952 it commenced the tunnel section of the work using two experienced tunnel men at $2.15 an hour and common laborers at $1.87½ an hour. In undertaking the portion of the subcontract involved in this controversy claimant ran into immediate conflict with labor unions which insisted that the tunnel work was not properly classified for unskilled labor, but called for higher paid and skilled classifications.

This seems to have been part of a controversy spilled over into this contract from previous labor disputes, for it is stipulated that for a number of years " there had been a continuous dispute between certain international officials of the Laborers' Union and the claimant " and that the " efforts " of the union were designed to prevent claimant's work on the tunnel and bring about " higher prevailing rates of wage ". As a result of this controversy, of a strike, of picketing and of other actions by the union, it is stipulated that " the entire project was shut down " October 17, 1952.

What follows immediately upon the stoppage of work is of importance in this litigation. The Department of Public Works on the same day (Oct. 17) requested the Industrial Commissioner to furnish " minimum hourly wage rates for the occupations of Liner Plate Laborer (free air) and Tunnel Laborer (free air) " for the general State road contract in question, and added that " Local Union Officials indicate these rates should be $2.14½ and $1.87½ respectively." To this inquiry the Industrial Commissioner on October 20, 1952 answered the department: " You are advised that " the " prevailing hourly wage rates for such work " was liner plate laborer (free air) $2.14½; tunnel laborer (free air) $2.14½ and common laborer $1.87. It is stipulated that the engineer of the Department of Public Works " informed claimant " of this communication from the Industrial Commissioner.

These classifications seemed not to have been regarded by the union members or the Department of Public Works as fully adequate to cover the area of dispute and in response to further inquiry from the department the Industrial Commissioner on October 27, 1952 answered the department that it " was advised " that the prevailing hourly wage rates for the " additional occupations " as requested by the department, including work on " a liner plate tunnel " were: miner, $2.82; miner's helper, $2.14½; mucker, $2.14½; tunnel laborer, $2.14½; and electrician $2.75.

It is not entirely clear from the way in which the stipulation of facts runs or from the direction of the arguments pursued in this court just what the legal effect of this advice given the Department of Public Works by the Industrial Commissioner in response to the two inquiries was; what effect it had on the rights of the claimant under the contract between it and the prime contractor; and especially whether it imposed any weight of legal compulsion on the claimant to pay the amounts contained in the Industrial Commissioner's " advice ".

Concerning the amount paid common labor in this work there is no issue, since the amount originally specified by the Industrial Commissioner for this classification was less by a half a cent an hour than the claimant itself was voluntarily paying. Nothing in the stipulation of facts shows that the Department of Public Works or any public official expressly directed the claimant to reclassify the work, or any part of the work, being done by common labor in this operation to become a "liner plate laborer" or a "tunnel laborer" or a "miner" or a "miner's helper". The stipulation of facts does not state that the Department of Public Works added these classifications to the specifications or requirements of the contract relating to the kind of work here in dispute.

What an engineer told the claimant the Industrial Commissioner had written the department is not a direction by the superintendent within any reasonable term of the contract; and the stipulated facts do not show that it was an order or a direction by the Department of Public Works or by any public officer that claimant replace laborer classifications with the new classifications stated by the Industrial Commissioner to be "the prevailing hourly wage rates for such work".

Moreover, if the claimant regarded this communication from the commissioner to the department as a binding determination of how it must reclassify the jobs of common laborer it was using in the work, it had a remedy which could be pursued; and that remedy was not a claim in the Court of Claims.

That the claimant recognized its clear right to judicial review of a determination of the Industrial Commissioner is demonstrated in the fact that it actually pursued such a review of a later (Dec. 19, 1952) determination of the Industrial Commissioner involving the same work and fixing still higher wage classifications in some respects, and succeeded in court in annulling it. (*Matter of Armco Drainage & Metal Prods. v. Moore,* 285 App. Div. 236.)

A fair reading of the stipulation of facts also would lead to the conclusion that, in the light of the continuing dispute with the union and the holding up of claimant's subcontract because of this, claimant used the October 27 rates stated by the Industrial Commissioner as a reasonable compromise of the labor controversy; and undertook to pay these amounts, not under compulsion of the State officers, but because these were the lowest rates it could induce labor to accept.

The stipulation states that on November 7 the local union engaged in the building trades (not the Laborers' Union)

" decided " to furnish labor to perform the tunnel work " at the rates set forth in the Labor Department letter of October 27 " and that on November 18 " work was resumed ". If one party offers to furnish and another to accept the offer so that " work was resumed " it is reasonable to construe the intent of such language to mean that claimant paid the money because it wanted to settle the labor controversy on the basis of these rates.

This intent becomes rather more clear when the additional words of the stipulation are read that on December 8 " despite the continuing efforts of the Laborers' Union " to " prevent work " the claimant " was successful in resuming the tunnel work " at the rates set forth in the Department of Labor letter of October 27. This successful resumption seems to us to have been based on voluntary acceptance of these rates.

As it has been noted, the rates fixed by the Industrial Commissioner on December 29, 1952 were higher than those of October 27, but were not paid at any time by the claimant who, far from feeling constrained to pay money by this determination, succeeded in annulling it by judicial review. Following this annulment the Industrial Commissioner made still further examination of the problem and long after the work was entirely finished, on December 2, 1955 made new classifications which were lower than those of October 27, which were the basis of claimant's actual payments to labor, but were higher than the amounts claimant had intended to pay originally under its interpretation of the schedule in effect when the subcontract and prime contract were let. Those 1955 classifications have become final and binding since they have not been reviewed by claimant.

The claim for damage against the State is based on the difference between the amount paid by claimant which followed the rates set in the October 27 communication of the commissioner and the amounts which it would have paid under its interpretation of the original schedules; or in the alternative, the difference between the amount that would have been due under final determination made by the commissioner in 1955 and the amount paid under the rates of October 27. The Court of Claims has dismissed the claim and granted judgment on the stipulation of facts.

We are of opinion that claimant is not entitled to recover under either theory of damage because it has not been demonstrated that the damage claimed has resulted from a breach of the contract with the State. For the purpose of discussion we

will assume that the claimant stands in the same position as the prime contractor were it pressing this claim for damage; although, since the labor provisions of the contract were designed to benefit labor even at the risk of a contractor's loss, it is debatable, at least, whether the labor provisions of the main contract between the State and the prime contractor were for the benefit of the subcontractor within *Lawrence* v. *Fox* (20 N. Y. 268). The State is not liable in damage for a breach of contract because of the effect on the contract of the rulings and determinations of the Industrial Commissioner on what are the prevailing wages for a particular kind of work under a statute which makes such determinations judicial in their nature; and, indeed, the State would not be liable if they were administrative and not judicial determinations.

For example, the determination of health authorities of the State in the exercise of their public functions might cause a citizen having a contract with the State to lose money because of increased costs in doing the work; but if the determinations were made within the frame of the statute and in good faith the State would not be called upon to answer in damage. The prosecution by the State for public offenses in the course of the work would also impose no liability for breach of contract. When one makes a contract with a sovereign one must expect the sovereign to perform its usual functions even though the contracting party may lose money thereby in the very subject matter affected by the sovereign determinations. A State does not yield sovereignty merely because it makes a contract for public work.

In its reply brief which serves to epitomize its position on this appeal, the claimant notes that it " does not question the power or the duty of the Industrial Commissioner to prescribe prevailing rates of wage on Public Works contracts or to vary those rates in the course of the performance of a contract in accordance with circumstances." But it argues that it bases its claim on its denial of the right of the " Commissioner of Public Works to vary the terms of the contract without subjecting the State to liability in damages by requiring a contractor to employ new classifications of labor " other than those he has undertaken to employ on the basis of experience.

But if, as it is thus conceded, the Industrial Commissioner has the power to vary the rates on a public works contract after the contract is let under stated wage schedules, no damage would arise based on the theory of breach of contract if the Public Works Department required the contractor to pay the

newly fixed rates; or the requirement arose from the penal effect of failing to pay them after a final determination in a proceeding before the Industrial Commissioner. Here it must be considered conclusively that the original schedules were wrong and inappropriate for the kind of work the claimant intended to do since by a final determination not reviewed on appeal the Industrial Commissioner has made new rates which have superseded the original schedules.

The errors which were ultimately corrected by the final order of the commissioner following the judicial proceeding instituted by claimant were in each successive instance errors in judgment or in decision by the Industrial Commissioner as a sovereign agency; and the contracting agency was required by the statute to follow those determinations made within the frame of jurisdiction of the Industrial Commissioner.

It is expressly agreed in the stipulation that the " classification of workmen " to be employed in the work in dispute was " prepared by the Department of Public Works * * * in good faith in accordance with data furnished by claimant ". This classification, as it has been seen, becomes the basis of the original determination of the Industrial Commissioner within subdivision 3-a, fixing classification of prevailing wages for the work performed.

If the department was mistaken in good faith about the information transmitted to the officer who had the duty of making classifications, it could scarcely be held to have breached its contract, especially where the information it gave the public officer having jurisdiction to make the determination was " in accordance with data furnished by claimant ".

It is quite immaterial that claimant also acted in good faith and without negligence in furnishing this data. That the data was wrong and that the classification based on it did not reflect accurately the prevailing wages for the work involved is conclusively established by the final determination made by the Industrial Commissioner in 1955 which is within the frame of the Industrial Commissioner's jurisdiction and which has not been reviewed or challenged by any party in interest and which the court must accept as binding. It is not easy to see how the claimant which gave the Department of Public Works the information can recover because the department did not anticipate that the Industrial Commissioner would make a different determination and forecast the result of that different determination in the original schedules. It could, indeed, not have done so in the light of the initial determination of the Industrial Commissioner based on the data furnished by claimant.

374

It is certainly not shown that the Department of Public Works did anything independently of the decisions and determinations of the Industrial Commissioner to cause claimant to pay higher wages; and, indeed, the stipulated facts show that it did nothing to enforce such determinations, but merely to advise the claimant that the determinations had been made. Moreover, we read the stipulation as showing facts of voluntary payment of the higher wages as a compromise with the unions and not as the effect of any compulsion by the contracting agency of the State.

The judgment should be affirmed, with costs.

FOSTER, P. J., COON, HALPERN and GIBSON, JJ., concur.

Judgment affirmed, with costs.